(No. 43004.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. SAMUEL SAIKEN, Appellant.

*Opinion filed October 4, 1971.—Rehearing denied Nov. 24, 1971.*

JOHN J. O'TOOLE and PETER GEORGES, both of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, EDWARD V. HANRAHAN, State's Attorney, of Chicago, (JAMES B. ZAGEL, Assistant Attorney General, of Chicago; ROBERT A. NOVELLE and ARTHUR L. BELKIND, Assistant State's Attorney, of counsel,) for the People.

MR. JUSTICE DAVIS delivered the opinion of the court:

The defendant, Samuel Saiken, was indicted by the circuit court of Cook County for the crimes of murder and conspiracy to obstruct justice. A jury returned a verdict of not guilty on the murder charge and guilty on the charge of conspiracy to obstruct justice.

The defendant claims that the search which lead to the discovery of the body of the victim was improper and in violation of constitutional and statutory provisions; that the jury verdict was against the manifest weight of the evidence; and that the trial court abused its discretion in denying probation and in sentencing him to the penitentiary for a term of not less that 2 nor more than 3 years.

The defendant was indicted for murdering Ella Jean Scott, also known as Tina Mumma, and for conspiring with

his son, Joel Saiken, to obstruct justice by concealing the victim's body in a steel drum and burying it on his farm in Chesterton, Indiana.

The victim was a friend of both the defendant and his son. The defendant testified that he met her at O'Hare Airport on November 4, 1967, and that they drove to the defendant's farm in Chesterton, Indiana, where they picked up Joel, the defendant's son, and the three of them, along with the victim's cat, then returned to the defendant's warehouse, in Chicago; that when they arrived at the warehouse, Joel and the victim went in, but Joel returned alone after five minutes; that shortly thereafter, Joel admitted that he had killed Mrs. Mumma. The defendant denied that he in any manner conspired to obstruct justice.

Joel testified that he never saw the victim alive on November 4 or 5; that he had been at the farm in Chesterton; and that his father had gone to O'Hare Airport to meet Mrs. Mumma. He further stated that his father came back alone the next day, and admitted to him that he (the father) had killed Mrs. Mumma; that he and the defendant then went to the warehouse and placed the victim's body in a steel drum; that the defendant then asked him to bury the body on the farm; and that he buried the body behind the goose barn on the eastern side of the farm.

The defendant's version was corroborated by a gas station attendant, who had seen the defendant, Joel, the victim and the cat, at, and about, his service station while minor repair work was done on the defendant's car at about 2 A.M. on November 5.

At the hearing on the motion to suppress evidence, Officer Young, on whose affidavit the search warrant was issued, testified that on the evening of February 18, 1969, he had a conversation with the defendant's son, Joel, for about one and one-half hours; that Joel told him that he had buried the body on the farm under a manure pile

behind the goose barn; and that the victim had died from a gunshot wound.

As a result of this information, Officer Harry Young obtained a search warrant on February 19, 1969, and made a search for the body. He dug near the goose barn for about two hours. The ground was frozen hard and he was unable to find the body. That evening he again talked to Joel, who further pinpointed the location of the body. The next day, Officer Young returned to the spot behind the goose barn and continued the excavation at the place where he had been digging the day before, and about 4 hours later he found the body.

The defendant contends that the affidavit of Officer Young on which the search warrant was issued, was insufficient in that it was based upon hearsay. The affidavit, subscribed to before Harry W. Estler, Justice of the Peace, stated:

"HARRY YOUNG swears that by virtue of information voluntarily conveyed to him by one JOEL SAIKIN on Tuesday, the 18th day of February, 1969, affiant has good reasons to believe, and does believe, that a dead human body, to-wit: a white, female approximately seventeen (17) years of age is secreted in and about the following real estate in Porter County, Indiana:

The East ½ of the Southeast ¼ of the Southwest ¼ of Section 17, Township 37 North, Range 5 West of the Second Principal Meridian, containing about 20 acres more or less,

said real estate being the property of Sam D. and Minnie Saikin, said dead body being secreted in the following place and manner, to-wit: buried beneath the ground behind the goose house on said premises, originally buried under or near a manure pile located behind or near the goose house on said premises, said manure pile subsequent thereto having been removed.

"Under and according to the provisions of Acts 1905,

page 169, paragraph 61, the same being codified as Burns Indiana Statutes 9—607, that the Honorable Judge of this Court, taking with him such constables and police officers as he shall designate, enter, inspect and search said premises for such dead female human body as soon as may be reasonably convenient to said Court and said judge."

The courts of the State of Indiana have held that an affidavit based upon hearsay information and conclusions of the affiant is insufficient to show probable cause and will not support the issuance of a search warrant. *(Johns v. State, 251 Ind. 172, 240 N.E.2d 60; McCurry v. State, 249 Ind. 191, 231 N.E.2d 227; Rohlfing v. State, 227 Ind. 619, 88 N.E.2d 148.)* In *McCurry*, the court acknowledged that its rule as to the sufficiency of an affidavit to support the issuance of a search warrant—that hearsay will not support the issuance of a search warrant—is not the rule as announced by the United States Supreme Court in *Jones v. United States, 362 U.S. 257, 4 L.Ed.2d 697, 80 S.Ct. 725.*

These circumstances give rise to the question of whether an Illinois circuit court in a prosecution before it should suppress evidence gained from a search in Indiana, which was illegal there because based upon hearsay information contained in the affidavit supporting the search warrant.

In *Burge v. State (Tex. Crim.App. 1969)*, *443 S.W.2d 720,* the defendant, an Oklahoma resident, was accused of burglary and attempted rape in Texas. While he was in custody, his wife agreed to allow police officers to search their Oklahoma home without a search warrant. Under Oklahoma law each spouse has a personal right to demand a search warrant prior to a search of the marital residence. The search, conducted without the defendant's consent, revealed crucial incriminating evidence against him, which was admitted at the Texas trial. On appeal, he contended that the trial court erred in admitting this evidence. The State urged that this was an evidentiary question, procedural in nature, and hence was governed by the laws of

Texas, which recognized interspousal authority to consent to the search. The reviewing court affirmed the trial court and held that the Texas-Oklahoma conflict was primarily upon the issue of the admissibility of evidence—one of procedure, and that the law of the forum governed.

Traditional conflict principles prescribe that issues of clearly procedural nature are governed by the internal laws of the forum, whereas substantive matters are controlled by the laws of the State where the transaction occurred.

Conflicting State views concerning the scope of the fourth amendment and of the additional rights granted to a party by a State, present a novel situation in the area of conflict of laws. The doctrine of *lex loci delicti* has been extensively criticized and there has been a propensity to replace it by a more flexible rule, *i.e.*, the rule of "significant relationship" embodied in tentative draft No. 9 of section 379, Reinstatement of the Law, Second, Conflict of Laws (1964). See *Graham v. U.S. Grant Post, 43 Ill.2d 1* and *97 Ill.App.2d 139,* and cases cited therein.

If the problem here presented is considered from the procedural-substance viewpoint, the evidence was properly admitted. *(People v. Kirkpatrick, 413 Ill. 595, 597;* Restatement, Conflict of Laws, sections 595, 597.) Evidentiary questions are generally governed by the laws of the forum. If the conflict concerning the choice of law encompassed the preliminary issue of whether the evidence was wrongfully obtained, a substantive matter, then from the viewpoint of "significant relationship" or "center of gravity" rules, the significant contacts were with Illinois. The crime was committed in Illinois; it was being prosecuted there; the defendant was a resident and citizen of Illinois; the great majority of the witnesses, who would testify at the trial, were Illinois residents; Indiana had no vital contact with the crime; and the application of Illinois evidentiary law would not offend the comity of interstate relationships between Indiana and Illinois.

In *United States v. Teller, (7th cir. 1969) 412 F.2d*

*374, 377; United States v. Martin, (7th cir. 1967) 372 F.2d 63, 65;* and in *United States v. Jones, (7th cir. 1966) 369 F.2d 217, 220,* the court held that evidence gained by eavesdropping, illegal under Illinois law, (Ill.Rev.Stat. 1965, ch. 38, par. 14—1 *et seq.*) was admissible in Federal prosecutions. These decisions rest on the premise that Federal courts are only required to follow Federal standards when Federal questions are adjudicated, regardless of whether such standards violate any additional rights granted to a party by a State.

*Ker v. California, 374 U.S. 23, 10 L.Ed.2d 726, 83 S.Ct. 1623; Miller v. United States, 357 U.S. 301, 2 L.Ed.2d 1332, 78 S.Ct. 1190;* and *United States v. Di Re, 322 U.S. 581, 92 L.Ed. 210, 68 S.Ct. 222,* while not in point, would seem to indicate that where a conflict occurs between the standards of two jurisdictions, there is no constitutional barrier, other than the fourth amendment, which precludes one jurisdiction from refusing to honor the standards of another relative to the validity of an arrest or search.

In *Elkins v. United States, 364 U.S. 206, 4 L.Ed.2d 1669, 80 S.Ct. 1437,* the court held that evidence obtained by State officers in a search which, if conducted by Federal officers, would have violated the defendant's rights under the fourth amendment, was inadmissible, over the defendant's objection, in a Federal prosecution. This exclusionary rule was applied before the application of the fourth amendment to the States and the establishment of the general exclusionary rule in *Mapp v. Ohio, 367 U.S. 643, 6 L.Ed.2d 1081, 81 S.Ct. 1684.* Under this rationale, the standards for the validity of a search may vary from State to State so long as they do not violate Federal constitutional standards.

Thus under either constitutional or choice of law principles, the evidence in question was admissible in Illinois, if the Indiana search met with the requirements of the fourth amendment.

Under the requisites of the fourth amendment, the matters presented in the affidavit in support of the warrant must be adequate to enable the magistrate to form an independent conclusion as to whether from the facts and underlying circumstances presented to him under oath, probable cause exists for the issuance of the warrant. However, reviewing courts will more readily accept the judicial determination of a magistrate with reference to probable cause and will uphold his issuance of a warrant on evidence of a less persuasive character than would have justified an officer acting on his own determination and without a warrant. *(Aguilar v. Texas, 378 U.S. 108, 111, 12 L.Ed.2d 723, 726, 84 S.Ct. 1509.)* Because of the preference for informed and deliberate determinations of magistrates over perhaps hurried actions of officers in making searches incidental to arrests, the affidavits are to be tested in a common sense and realistic manner and with great deference to the magistrate's determination of probable cause. *United States v. Harris, 403 U.S. 573, 29 L.Ed.2d 723, 730—732; Spinelli v. United States, 393 U.S. 410, 419, 21 L.Ed.2d 637, 645, 89 S.Ct. 584; People v. Parker, 42 Ill.2d 42, 45.*

The United States Supreme Court has held that hearsay information set forth in an affidavit, may be sufficient to support the issuance of a search warrant, as long as the affidavit contains a substantial basis to support the credibility of the hearsay information. *(United States v. Harris, 403 U.S. 573, 29 L.Ed.2d 723, 732; Jones v. United States, 362 U.S. 257, 271, 4 L.Ed.2d 697, 708, 80 S.Ct. 725.)* We have adhered to that rule. *People v. Mitchell, 45 Ill.2d 148, 152, 153; People v. York, 29 Ill.2d 68, 70; People v. Williams, 27 Ill.2d 542, 544.*

In *Aguilar,* the court said that for hearsay to justify the issuance of a warrant, the affidavit must set forth some underlying circumstances tending to substantiate the informant's conclusions and some underlying circumstances from which it could be believed that the informant's

information was credible or reliable. 378 U.S. 108, 114, 12 L.Ed.2d 723, 729, 84 S.Ct. 1509. .

In *Spinelli v. United States, 393 U.S. 410, 425, 21 L.Ed.2d 637, 649, 89 S.Ct. 584,* Mr. Justice White, in a separate concurring opinion stated: "If the affidavit rests on hearsay—an informant's report—what is necessary under *Aguilar* is one of two things: the informant must declare either (1) that he has himself seen or perceived the fact or facts asserted; or (2) that his information is hearsay, but there is good reason for believing it—perhaps one of the usual grounds for crediting hearsay information. The first presents few problems: since the report, although hearsay, purports to be firsthand observation, remaining doubt centers on the honesty of the informant, and that worry is dissipated by the officer's previous experience with the informant. The other basis for accepting the informant's report is more complicated. But if, for example, the informer's hearsay comes from one of the actors in the crime in the nature of admission against interest, the affidavit giving this information should be held sufficient." Also see *United States v. Harris, 403 U.S. 573, 29 L.Ed.2d 723, 734.*

In the case at bar, the informant, Joel Saiken, personally saw or perceived the facts asserted. He buried the body. A number of facts are recited as to the location of the body, and we have the first situation referred to by Mr. Justice White. The remaining question is whether there is a basis presented in the affidavit to suggest that the informant is honest in what he has said. The assertions of the informant—that he buried and hid a dead body— constitutes an admission of his implication in a crime, which is sufficient to lend credence to what he has said. We believe there was substantial basis for crediting the hearsay information, and that the search warrant was properly issued upon the affidavit.

The defendant claims that even if the search warrant were valid, the search on the second day was an independ-

ent search, not pursuant to the original warrant. He refers us to *McDaniel v. State, 197 Ind. 179, 150 N.E. 50,* and *Tongut v. State, 197 Ind. 539, 151 N.E. 427.* However, we find that these cases are not applicable to the case at bar.

In executing the warrant, the officers commenced digging in search for the body but because the ground was frozen hard they were unable to complete the search the first day. Upon further pinpointing the burial location, they resumed the work of the search the following morning and found the body. They had proceeded with diligence, and their conduct the second day constituted a continuation of the initial search.

Section 9—607 of Burns Indiana Statutes, Ann. (Acts of 1905, ch. 169, sec. 61, p.584) provides that when an affidavit is filed before a justice of the peace or city judge alleging that a dead human body is hidden, such justice of the peace or city judge, taking with him a constable or police officer, may enter, inspect and search for such dead body "and in making such search, they shall have the powers of officers executing search warrants." The search was conducted under the provisions of this section. The defendant claims that the search was improper because the justice of the peace, who went to the premises on the first day, did not return the second day. We have been unable to find any interpretation of this section of the statute by the Indiana courts. However, we do not believe that the statute can reasonably be interpreted to mean that the justice of the peace must remain on the premises during the entire search. The statute states that the justice of the peace shall take with him a constable or police officer and that "they" shall have powers of officers executing search warrants. The word "they" clearly refers to the officer as well as the justice of the peace. Inasmuch as the search on the second day was a continuation of the initial search, we find no greater basis for holding that the justice of the peace had to return to the site on the second day of the search than for finding that he had to remain on the

premises during the entire period of the search on the first day. Neither such determination is required and we find the search to be a legal one.

The jury chose to disbelieve the version of events testified to by Joel regarding who actually committed the murder, but by its verdict, apparently it believed that part of his story relating to the manner of disposing of the body. There was, of course, a great deal of self-interest in the matters testified to by Joel—especially as to who committed the murder. However, the conclusion reached by the jury is not so improbable or unreasonable, particularly in view of the defendant's vague testimony regarding the disposition of the body, that we should substitute our conclusion in its stead.

The defendant has urged that the verdicts were inconsistent. He was indicted in separate counts for the crimes of murder and conspiracy to obstruct justice. We cannot speculate as to why the jury found him not guilty of murder, but such finding did not invalidate the jury finding of guilty on the conspiracy charge. The evidence concerning such charge was sufficient to sustain the conviction. We find 'that the verdicts here were not inconsistent.

The sentence imposed by the trial court was within the limits prescribed by statute. Our power to reduce and modify sentences should be exercised with caution. Considering all of the elements of this case and the matters brought to the attention of the trial court, we do not find that the imposition of the penalty imposed by the court constituted a great departure from the fundamental law and its spirit and purpose, or that it was manifestly in excess of the proscription of section 11 of article II of the Illinois constitution. *People v. Taylor, 33 Ill.2d 417, 424; People v. Smith, 14 Ill.2d 95, 97.*

The granting of probation was within the discretion of the trial court. Its determination is subject to review to the extent of ascertaining whether the trial court did, in fact,

exercise discretion or whether it acted in an arbitrary manner. *(People v. Sims, 32 Ill.2d 591; 596.)* The scope of the judicial discretion is set forth in section 117—1 of the Code of Criminal Procedure of 1963. (Ill.Rev.Stat. 1969, ch. 38, par. 117—1.) In considering the matters pertinent to the defendant's conduct, to his rehabilitation and to the public interest, we do not believe that the trial court acted arbitrarily. Therefore, the judgment will be affirmed.

*Judgment affirmed.*